GEORGE V. R. LEWIS, as Administrator, etc., Appellant, *v.*
THE PRESIDENT, MANAGERS AND COMPANY OF THE DELA-
WARE AND HUDSON CANAL COMPANY, Respondent.

The fact that a railroad passenger has taken passage on a train which
does not stop at the station where he desires to get off does not affect
the measure of duty of the railroad company or the degree of protection
to which he is entitled against the negligent acts of its servants; while
on the train the company owes to him the same duty of protection
against negligence as to the other passengers.

In an action to recover damages for the death of plaintiff's intestate, plain-
tiff's evidence tended to show these facts: L. was a passenger on one of
defendant's trains and desired to get off at a station at which the train
did not stop; he was advised by the conductor that no stop was to be
made there. Before reaching the station the train slowed up and came
almost to a stop near a bridge to enable a freight train, approaching on
another track, to pass it, as the tracks were too close together on the
bridge to allow two trains to pass. The conductor told L. in substance
that he would have to get off there, and, as the train would be moving
faster soon, he would have to get off quick. L. went to the rear of the
car; to one standing there the freight train was not visible. As L.
stepped down from the car it gave a jerk, causing him to lose his bal-
ance; he fell upon the other track and was killed by the freight train,
the engine of which reached the spot just as he fell. *Held* (FINCH,
GRAY and HAIGHT, JJ., dissenting), that the evidence was sufficient to
require the submission to the jury of the question as to defendant's
negligence, and as to contributory negligence on the part of L. ; and so,
that a non-suit was error; that the evidence justified a finding that L.
was induced to leave the train in face of a danger, *i. e.*, the approaching
freight train, which caused his death, of which he was not aware, but
which must have been known to the conductor, and of which he should
have advised L.

*Hunter* v. *C. & S. V. R. R. Co.* (112 N. Y. 371; 126 id. 18), distinguished.
*Lewis* v. *Pres., etc., D. & H. C. Co.* (80 Hun, 192), reversed.

(Argued March 20, 1895; decided April 9, 1895.)

APPEAL from judgment of the General Term of the Supreme
Court in the third judicial department, entered upon an order
made July 14, 1894, which affirmed a judgment in favor of
defendant, entered upon a decision of the court on trial at
Circuit dismissing the complaint.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James W. Verbeck* for appellant. It was not negligence *per se* to attempt to get off the moving train. (*Filer* v. *N. Y. C. R. R. Co.*, 49 N. Y. 47; *Morrison* v. *E. R. Co.*, 56 id. 306.) The fact that the train was moving, if at all (although this is not conceded) at the time Lewis was ordered to get off, would make no difference in this case. The moving train did not directly cause the injuries from which Lewis died. (*Weiler* v. *M. R. Co.*, 53 Hun, 372; *McIntyre* v. *N. Y. C. R. R. Co.*, 37 N. Y. 287; *Corcoran* v. *N. Y. E. R. R. Co.*, 19 Hun, 358; *Reid* v. *Mayor, etc.*, 139 N. Y. 534; *Coleman* v. *S. A. R. R. Co.*, 114 id. 609; *C., H. & I. R. R. Co.* v. *Carper*, 112 Ind. 26; *D., etc., R. R. Co.* v. *Curtiss*, 23 Wis. 152; *Hanson* v. *M., etc., R. Co.*, 58 Am. Rep. 162; *Pool* v. *C., etc., R. W. Co.*, 53 Wis. 657; *Jones* v. *C., etc., R. Co.*, 42 Minn. 183; *S. L., etc., R. R. Co.* v. *Cantrell*, 37 Ark. 519; *Filer* v. *N. Y. C. R. R. Co.*, 49 N. Y. 47.) Contributory negligence is very rarely a question of law. It is only when the evidence is clear and uncontradicted that it becomes a question of law. (*Stackus* v. *N. Y. C. & H. R. R. R. Co.*, 79 N. Y. 446; *Filer* v. *N. Y. C. R. R. Co.*, 49 id. 50; *Bucher* v. *N. Y. C. & H. R. R. R. Co.*, 98 id. 128; *Glushing* v. *Sharp*, 96 id. 676.)

*Lewis E. Carr* for respondent. The plaintiff's case failed because there was no evidence of negligence on the part of the defendant. (*Tolman Case*, 98 N. Y. 198, 202; *Cordell Case*, 75 id. 330, 332; *Bennett* v. *R. R. Co.*, 69 id. 594; *Nolan* v. *R. R. Co.*, 9 J. & S. 541.) The non-suit was right, because there was a total failure of proof showing the exercise of care on the part of the deceased. On the contrary, the evidence established contributory negligence on his part. (*Tolman* v. *R. R. Co.*, 98 N. Y. 198; *Hunter* v. *R. R. Co.*, 126 id. 18; *Solomon* v. *R. R. Co.*, 103 id. 437; *Kraus* v. *W. V. R. R. Co.*, 69 Hun, 482; *Davis* v. *L. V. R. R. Co.*, 64 id. 492.)

O'BRIEN, J. The plaintiff's intestate was killed in an accident on the defendant's railroad, near Central Bridge station, on the 18th of September, 1889. This action was brought upon the theory that the defendant is legally responsible for the injury which resulted in his death. On the trial, and at the close of the plaintiff's case, the learned trial judge granted a motion for a non-suit, to which the plaintiff excepted.

The appeal to this court presents the question whether, upon the proof given, the plaintiff was not entitled to have the case submitted to the jury. The trial court having disposed of the case as presenting only a question of law the judgment must be upheld, if at all, upon the principle that upon no reasonable view or construction of the evidence could the action be maintained. If the proof given was of such a character as to warrant opposing inferences, or to justify different conclusions of fact in the minds of reasonable men, the case was for the jury.

On the day of the accident the deceased, who lived in Schenectady, got on to a train on the defendant's road at Cobleskill, for the purpose of reaching his home, but in order to do that by the regular route it was necessary to change cars at Quaker Street station. It appears that it was what was called a through train, that made no stop at any station between Cobleskill and Albany, but whether the deceased knew it or not when he boarded the train does not conclusively or satisfactorily appear. Before reaching the next station, which was Central Bridge, about three miles further east, the deceased was informed by the conductor that no stop would be made at Quaker Street. After passing the Central Bridge station and reaching a point about a thousand feet west, where a bridge crosses a stream, the train slowed up and, in the language of one of the witnesses, came almost to a stop. The conductor then told the deceased that he would have to get out quick, that the train would not stop at Quaker Street, and would be running faster very soon. The deceased immediately got up from his seat, went to the rear

of the car and stepping down, had just reached the ground when in some way he lost his balance and was thrown under a freight train passing rapidly in the other direction, close to the train from which he had just landed. The tracks at this point, it seems, are close together, and the reason, apparently, for reducing the speed of the passenger train, till it came almost to a stop, was to enable the freight train going in the other direction to pass it.

There were two witnesses sworn who witnessed the transaction and it will be perhaps best described in their own language. The first one was Tracy, who was evidently traveling with the deceased, and his version is as follows:

"Was acquainted with Moses Lewis in his lifetime; remember September 18, 1889; I was at Cobleskill on that day; saw Mr. Lewis there on that day walking around the streets; afterwards he and I took the train at Cobleskill to go to Quaker Street, and just before we got to Central Bridge the conductor came in and said, 'Tickets,' and Lewis handed him his mileage book; Lewis said, 'Two to Quaker Street;' conductor said, 'I don't think we will stop at Quaker Street;' he took the book and tore out some tickets, and said, 'I will see;' he went on to the other end of the car and came back, and in the meantime Lewis said, 'You have stopped there before;' he said, 'I will see;' he came back in about a minute or so and said, 'We will not stop at Quaker Street; you have got to get off here, and get off here quick; the train will be moving faster soon;' we started and walked to the rear platform; we walked there with a quick step; we walked quick. Lewis was first and got down and took hold of the railing, and stepped off on the right-hand side; as we went to the rear end of the car he turned to the right and took hold of the railing and stepped off, and about the time he stepped off the train gave a sudden jerk and threw him against the rear end, and he seemed to whirl right round over the track and fell in under a freight train; when he got out on the platform I did not see the freight train; it was not in sight."

In response to some direct questions he further stated:

" Q. As Lewis started to get off the train, describe what movements, if any, he made ?

"A. After he had hold of the railing, when it gave the jerk, he tried to get back.

"And when Lewis got off the last step the freight train was not visible to me, standing on the rear platform.

" It was the freight train that ran over Lewis ; I do not know what part of the train he fell under ; I could not see ; the engine of the freight train did not get by him before he finally let go ; it was not by ; it was just there."

This statement was not materially changed on cross-examination, and being re-examined he further said that there was no freight train to be seen when he started to go down the steps.    " We were trying to get off on the side where the depot was.    Lewis took hold of the railing and was stepping off ; the train gave a jerk and that threw him against the railing, and he seemed to hang on for a second and fell down. This was all done in a second ; done quicker than you could tell it.    When he whirled and fell down that was the first time I saw the freight train."

The other witness, a man named Burns, a passenger on the train, thus describes what took place : " I was at the time in Cobleskill ; have heard Mr. Tracy testify as to the accident that occurred near Central Bridge ; I remember that occasion ; I got on that train at Cobleskill ; was going to Albany ; got in the rear car ; sat on the north side of the car facing the rear end ; saw the witness Tracy ; he sat next to the window facing me ; Lewis sat with him ; did not know him at that time ; Lewis sat on the outside facing me in the same seat with Tracy.

" Q. Do you remember just before you got to Central Bridge the conductor came through ?

"A. I think I can.

" Q. What happened ?

"A. The conductor came in for his ticket and this man, Mr. Lewis, took a ticket out of his pocket, or a book ; I think it was black, and gave it to the conductor, and the conductor returned it to him again.

" Lewis said he wanted to get off at Quaker Street to go to Schenectady ; the conductor told him to wait a minute, to wait and see, he would come back ; something like that, and he returned the book to him, and he put the book in his pocket.

" The conductor went to the rear of the car ; then he came back and touched Lewis on the shoulder and told him he would have to get off there before they were going any faster than they were going.

" He got up and went to the rear of the car, and Tracy and four or five men at the rear, I could not tell exactly, and started to get off on the right ; the last time the conductor came back he said to Lewis : ' It is going pretty slow now, and it will be going faster, and you better get off now ; that is all I have to say about it ; ' he told him it was a through train and did not stop at Quaker Street ; when Lewis and Tracy got to the rear platform I was looking to the rear ; looking right at them ; they went off at the rear of the car ; it was all done in a minute ; somebody pulled the bell ; before that, when they got out on the platform, the train was just about going, and that is all there was of it ; it was not going very fast ; as they got out there it began to pull up all of a sudden ; it did not stop ; it went quicker ; the next thing I saw, somebody came and says : ' Now you have got to stop, you have killed a man ; ' but I could not say who it was ; then the train stopped and backed up, and I got off and saw this man lying there with his legs cut off ; at the time the conductor spoke to him first, when he came to take his ticket, it seemed to me that the train was just about pulling in pretty fast, but I could not tell how many miles an hour ; we had not quite got then to the Central Bridge depot.' "

The judgment below proceeded upon the ground that this testimony was not sufficient to warrant a finding of negligence on the part of the defendant, and that it did show affirmatively that the deceased was chargeable with contributory negligence.  Whether the deceased had paid fare as a passenger to some point east of Cobleskill or not is left in some doubt by the testimony.  The conductor was not sworn, or

any evidence given in behalf of the defendant.   If that was a material fact it should have been passed upon by the jury, as the proof was *prima facie* sufficient for their consideration on that point.   But we think it was not material.   The most that can be urged by the defendant in this respect is that the deceased was by mistake in the wrong train.   But that circumstance did not affect or change the measure of duty which the defendant owed him as a passenger, or the degree of protection to which he was entitled against the negligent acts of the carrier or its servants.   It is true that unless he took passage and paid fare to Albany, the next station where the train stopped, he could have been required to leave the train, but while on it the company owed him the same duty of protection against negligence as the other passengers.

One of the questions for our consideration is whether upon the evidence given the jury could have found that the defendant did not perform that duty.   It is not very material whether the language of the conductor to the deceased be regarded as a request, a direction, or an advice to leave the train.   It might have been understood as a direction.   The witnesses differ somewhat as to the words he used, and the construction to be placed upon his language was for the jury if that question was of any importance.   The jury could have found that the deceased left the train, not of his own motion or upon his own judgment, but in obedience to the wish and suggestion of the conductor, and, but for what the conductor said to him, he would have remained in the car.   The conductor's action must be judged by the circumstances existing at the time.   He brought the train almost to a stop while approaching the bridge and the coming freight train, and it could be inferred from the general situation that this was for the purpose of allowing it to pass.   The presence of this freight train was an element of danger not necessarily known to the deceased, but which was or should have been known to the conductor.   It was the passage of that train at the time the deceased was alighting from the passenger car that caused his death.   Had the request, direction or invitation to get off

been given at some other time or at some other place where the only danger to be feared was that incident to getting off from a train moving at a slow rate of speed, there is no reason to believe that the deceased would have been injured. The deceased was induced to leave the train in the face of a danger which he may not have been aware of, but which must have been known to the conductor. It cannot be said as matter of law upon this evidence that the deceased knew of the approaching train which caused his death or could have seen it in time to avoid the danger. That was a proper question for the jury, but we cannot say that the deceased in the hurry and excitement of the moment and in the suddenness of the emergency either knew or could have known of the danger that awaited him on leaving the car, while the conductor did, or at least the jury could have taken that view of the evidence. Had the conductor stopped the train and requested the deceased to get off at a place where another train was passing at the same time, without warning him of the danger, it would be for the jury to say whether the carrier had used that degree of care which the law exacts of it under such circumstances. So we think that the conduct of the defendant's conductor in this case presented a question for the jury. (*Bucher* v. *N. Y. C. & H. R. R. R. Co.*, 98 N. Y. 128; *McIntyre* v. *N. Y. C. R. R.*, 37 id. 287; *Weiler* v. *Manhattan Railway Co.*, 53 Hun, 372; *Reid* v. *Mayor*, etc., 68 id. 110; 139 N. Y. 534; *Pool* v. *Chicago, etc., Railway Co.*, 53 Wis. 657; Wharton on Neg. § 371; *Keating* v. *N. Y. C. & H. R. R. R. Co.*, 49 N. Y. 673.)

The language of the defendant's servant, whatever its fair construction may be, was calculated and intended to put the deceased in motion, and may be regarded as the moving cause of his attempt to leave the train at the time and place that he did. The conductor, it must be presumed, knew the exact situation, the distance between the tracks which brought the trains close to each other, the presence of the coming freight train and the other elements of danger, if any, to which the deceased would be exposed in leaving the train. If, with

knowledge of the existence of a latent danger, known to him but not to the deceased, he requested or invited him to encounter this danger without informing him of it, or guarding against it, he failed to perform that duty to the passenger which the law requires.

In dealing with the passenger the conductor represented the corporation, and any omission of duty or neglect on his part may be imputed to the defendant.

Nor do we think that the evidence was of such a character as to warrant the learned trial court in deciding that the deceased was, as matter of law, guilty of negligence contributing to the injury resulting in his death. It cannot be affirmed, as a legal result of the evidence, that he was aware of the presence of the approaching freight train, or that, in the hurry and excitement of the moment, he could or ought to have seen it. The evidence on that point is not very clear, but as it appears in the record the question could not properly have been taken from the jury. So far as appears the deceased had no reason to believe when he left his seat in the car that the conductor had invited him to alight from the train at a point where he was liable to encounter another, running at a high rate of speed in an opposite direction, and whether he discovered it on reaching the platform or before alighting was, upon the evidence, a question of fact. In this view the only other ground upon which contributory negligence could have been predicated is the undisputed fact that the deceased attempted to alight from a train while in motion, at a low rate of speed, at the request, direction or suggestion of the conductor. It is urged that negligence on the part of the deceased follows from that fact as a necessary legal inference, irrespective of what the conductor said or of the circumstances under which the passenger acted. This proposition is asserted upon the authority of the *Hunter* case, which was considered in this court upon two occasions (112 N. Y. 371; 126 id. 18). The deceased in that case attempted to board a moving train in the face of a situation and under circumstances attended with peculiar danger. Here the deceased

attempted to alight from one without being aware, so far as appears, of the presence of the approaching train which caused his death or any other danger except such as was involved in the act itself. The *Hunter* case recognizes a manifest distinction between the case of a passenger getting on and off a moving train. In the latter case the act may be justified or excused by a necessity or what is termed a stress of circumstances that cannot exist in the former. It is not necessary now to point out all the reasons upon which this distinction rests since this court has held upon full consideration that a passenger in attempting to alight from a moving train, under circumstances not unlike those appearing in this case, was not guilty of negligence *per se,* but that the question was one of fact for the jury. (*Filer* v. *N. Y. C. R. Co.,* 49 N. Y. 47.) The same principle was assumed or decided in some of the other cases above cited.

There is no inflexible rule of law that determines the nature of the act of the deceased in attempting to alight from the train. It must be viewed in the light of the actual situation as it appeared to him and judged by that measure of care and caution which a person of ordinary prudence is expected to observe under like circumstances. The conductor had presented to the mind of the deceased the alternative of leaving the train immediately in order to reach his destination or of being carried out of his way to a distant point. There was but little time for thought or reflection, and whether, under such circumstances, the passenger made a prudent or a reckless choice was a question to be determined by the judgment of reasonable men. He had a right to assume that the conductor would not expose him to any concealed danger from a passing train. Had he been informed of that element of risk he might not have assumed it or might have guarded against it. Whether, under all these circumstances, his conduct was careless or prudent was a question which could not properly be determined by the court, but belonged to the jury.

The judgment must, therefore, be reversed and a new trial granted, costs to abide the event.

FINCH, J. (dissenting).    The plaintiff's intestate was crushed under the wheels of a freight train and died from the effect of his injuries.    The administrator sued to recover damages, but was non-suited at the trial and the General Term have affirmed the consequent judgment.    I think the decision was clearly right and beyond any reasonable criticism.

The intestate boarded the defendant's train at Cobleskill, desiring to go to Schenectady.    That he was no stranger to the situation is indicated by two facts.    He had a mileage book of the company containing its tickets, which he would not have purchased unless in the frequent habit of passing over the road, and his remark to the conductor about the previous stopping of the same train at Quaker Street indicates his familiarity with its character and his habitual use of it.    It was a through train bound to Albany, not scheduled to stop at Quaker Street, and inviting no passengers for that station.    This fact the intestate perfectly well knew, and it was his duty to have known it before he went upon the train.    What he desired to do was to leave the car at Quaker Street and go by another train direct to Schenectady, instead of following the two sides of the triangle and traveling first to Albany and then to Schenectady, which was the longer and more expensive route.    He took the through train, hoping it would stop at Quaker Street, but without any invitation to enter based upon that possibility.    He could reach his destination safely by either route, and he simply took his chances of being able to get off at the point which he preferred.    He had no right to any such permission, and it is quite obvious that he knew it.    The intestate was in the rear car of the train.    When the conductor appeared and asked for tickets the intestate gave him his mileage book, saying, " Two for Quaker Street."    The deceased was sitting by the side of Tracy, who was a witness for the plaintiff, and gave his testimony with a very commendable fairness and intelligence.    It is his evidence that I shall follow for an account of the accident.    In answer to intestate's announcement of his proposed destination " conductor said, I don't think we

will stop at Quaker Street; he took the book and tore out
some tickets, and said, I will see; he went on to the
other end of the car and came back, and, in the meantime,
Lewis said, You have stopped there before; he said, I will
see; he came back in a minute or so and said, We will not
stop at Quaker Street; you have got to get off here and get
off quick, the train will be moving faster soon." When this
conversation began the train was moving rapidly. When it
ended the brakes had been applied and it was moving, very
slow, but still in motion. It did not stop at all until after the
accident. That is what every witness testifies to except one.
He was a Presbyterian minister sitting in a different car from
deceased, and with nothing to draw his attention to the precise
facts. He said: "The train nearly stopped; I don't know
but it did come to a stand-still;" but, on cross-examination,
he said: "Am not able to say whether the train came to a
stop or not." The uncontradicted evidence, therefore, is that
it greatly abated its speed, but was in motion when the
accident happened. Tracy's account of the conversation is
varied somewhat in its form by the testimony of Burns, who
said: "The conductor went to the rear of the car; then he
came back and touched Lewis on the shoulder and told him he
would have to get off there." The witness stated the con-
ductor's language thus: "It is going pretty slow now, and it
will be going faster, and you better get off now; that is all I
have to say about it." No other witnesses describe the con-
versation. It is not easy to misunderstand what was said. It
was not a command to leave the train, nor a direction to do so,
nor a statement in any manner controlling the free action or
free choice of Lewis. It informed him of two facts bearing
upon his convenience; one, that the train would not stop at
Quaker Street, the other, that, if he chose not to go to Albany,
his only opportunity was to get off at once while the train was
going slow, and, if he preferred to do that, he must do it
quickly, for the train would soon be going faster. Any differ-
ent construction of the conductor's words would be possible
only as a last resort in the technical atmosphere of a law suit.

They simply notified Lewis of an opportunity to be availed of
promptly, if at all, and left him to choose between a safe ride
to Albany and the experiment of leaving the train while mov-
ing slow.  Lewis chose to avail himself of the opportunity and
get off of the train while its motion was slight.  He made this
choice, not under a stress of circumstances occasioned by the
neglect or wrongful act of the company, which we have some-
times admitted as an excuse, but solely for his own convenience
and as the result of his own voluntary act.  The company had
in no manner created or caused the emergency which occa-
sioned his choice.

It is probable that the train slackened its speed to enable a
freight train approaching on the other track to first cross the
bridge on which the two tracks were so close together that
only one train could pass at a time.   The proof does not show
whether this was a usual or an exceptional circumstance.   If
usual, it would be a just inference that the conductor, know-
ing the place at which the brakes were applied, would infer
the approach of a coming train first reaching the bridge.   If,
however, the express train, as is generally the case, had the
right of way and it was the ordinary duty of the freight train
to wait on the other side for the express to pass, or the com-
ing train was "belated," as the plaintiff's counsel says, though
I see no such proof in the case, or if from any other cause the
slackening of speed at that point was exceptional, then it will
not follow that the conductor knew, or ought to have known,
that the freight train was approaching.   The proof permits
only of a guess on that point more or less reasonable accord-
ing to the general knowledge with which oné looks at it.

Returning to Tracy's account of the accident, and he is the
sole and only witness who saw it and was able to describe it, it
appears that he and Lewis both at once arose at the end of the
conductor's statement, and came out upon the rear platform of
the car.   Lewis had in his left hand an umbrella and an over-
coat, approached the steps leading to the side of the train, and
with his right hand took hold of the iron rail fastened to the
body of the car.   What then occurred should be repeated in

the words of the witness.  " Lewis was first and got down and took hold of the railing and slipped off on the right-hand side; as we went to the rear end of the car he turned to the right and took hold of the railing and stepped off, and, about the time he stepped off, the train gave a sudden jerk and threw him against the rear end and he seemed to whirl right around over the track and fell in under a freight train;" * * * " I saw what he had hold of; he had hold of the railing that was on the end of the body of the car; I saw him step down; saw him step off; step down on the ground;" * * * " When Lewis stepped down that way he had an umbrella and an overcoat in his left hand; when he stepped down I saw his feet strike the ground; his feet did strike the ground; when he stepped on the ground he had hold of the railing of this car; he did not continue to hold on to it more than a second I think; and it was after he had fairly alighted on the ground; the sudden motion of the passenger train I spoke about was just about as he was in the act of stepping off; his feet had not struck the ground then; then after that he stepped down from the step and struck on the ground with both feet fairly, and retained his hold of the railing after that." * * * " I saw him spin around; that was when he was yet holding on the railing; when he was turning round; it was just after that; the jerk of the train came before that, when he was still on the steps; I could not say as to whether the jerk of the train threw him off under that train; it threw him against the rail; I saw him get on the ground with both feet; saw him still hold on the railing with his hand; he was still upright, with his face toward the engine; I noticed that he was moving along in the same direction as the train at that time." * * * " So far as I observed, when he came out on the platform, Lewis did not make the slightest observation." * * * " He took hold of the railing and was stepping off, and, as he was stepping off, the train gave a jerk, and that threw him against the railing, and he seemed to hang on for a second and fell down; this was all done in a second; done quicker than you could tell it."   That is the whole evidence

of the accident and its cause.   It puts an end utterly to the
theory that getting off of the moving train had nothing to do
with the injury, and shows that it had everything to do with
it, and was its sole explanation and cause.   We see Lewis at
the very last moment with his hold on the train unloosened,
pulled along in its direction and spinning round with a fall.
The whole thing occupied but a second.   In telling it it seems
longer, and the effort of the witness to analyze the sudden
jerk and whirl makes it appear slower than the almost instan-
taneous event.   That he might have seen the approaching
freight train if he had looked; that he might have heard it
if he had listened; that he took no observation whatever;
that the jerk of his own train threw him off the step, and as
his feet struck the ground his hold on the railing swept him
from his balance; these are facts, obvious and beyond reason-
able question, and which show that the deceased, instead of
being free from negligence, met his death from that cause.
We have held too often that it is a negligent act for one
to get on or off of a moving train to discuss the subject
anew, and the only condition which we have ever allowed
to make it excusable did not, as I have shown, exist
in this case.   That excuse, allowed so far to modify the
character of the act as to permit a jury to regard is as not nec-
essarily negligent, was first stated in *Filer* v. *N. Y. Central
R. R. Co.* (49 N. Y. 47), in which it was held that where the
passenger by the wrongful act of the company is put to an
election between leaving the cars while moving slowly or
losing the station where he has a right to stop, the question of
negligence becomes one of fact.   It was not denied that
alighting from a moving train was wrong or dangerous, but
the decision went upon the ground that the act was not one
of free agency, but was the product of coercion produced by
the wrongful act of the company.   In this case the election
was occasioned solely by the fault of Lewis himself.   He
voluntarily and deliberately put himself in a position where
there was but a possible chance of alighting at Quaker Street,
and when that chance was gone the choice between leaving

the train moving slow and going safely to his destination, flowed from his own fault, and was not produced by any wrongful act on the part of the company. A man cannot himself occasion the stress of circumstances under which he chooses, and then put them upon the company as an excuse for a dangerous act. We refused after a deliberate discussion to extend the principle of that rule so as to destroy it, in the case of *Hunter* v. *C. & S. V. R. R. Co.* (126 N. Y. 18). We there held that the person injured acted as a free agent, that is, not coerced or compelled to choose by any fault or wrongful act of the company, and that his convenience or inconvenience was a matter of no account, and further that the invitation of the conductor did not alter that free agency, or put any sort of coercion upon it. The same thing is true here. I do not regard the words of the conductor as amounting even to an invitation. They furnished a possible alternative having a risk about it which the passenger was free to accept or not, and left him to choose. Between these words, however regarded, and the accident lay the free agency of the passenger, not coerced by the company, and which it had not lessened, warped or controlled by any wrongful act of its own. No responsibility for the choice rested upon it.

Beyond that, we held in the *Filer* case, in spite of the stress of circumstances and the invitation of the train agents, that the passenger was not absolved from prudence and care in alighting from the moving train. We said of the then plaintiff that " if, in leaving the cars, she did not exercise the care and caution which she might and ought to have done, and was careless and negligent in her movements, or in the care of her dress, and by reason of such want of care caused or contributed to the injury, she ought not to recover." Here, not only is no care or caution affirmatively shown, but the absence of it is proved. The passenger put his convenience above his safety. He knew it was risky and unsafe to alight from a moving train; that he was about to take that risk; that another track was alongside warning him of peril from that direction; that a train might pass at any moment and increase

the danger of his intended act, but, instead of exercising a care commensurate with the known danger, Lewis rushed off hastily in the face of the freight train, without making the slightest observation, when he might easily have seen it if he had looked. It is said the conductor should have warned him. But Lewis knew everything except one, and that one he was bound to expect might occur. Possibly the conductor did know that the freight train was approaching, although there is no proof of the fact. It is equally possible that he did not know. He was inside the cars where he could not see and might not have heard ; the slowing of the train may have been a common and prescribed act before crossing, and not indicative of an approaching train having a right of way, and the train which did come out of its time, even if the conductor knew what its regular time was. If we are to guess about it, the chance of guessing right is very slender. But what the conductor may have known, the passenger was bound to expect, whether warned or not, and the duty of care and prudence which he did not exercise remained.

These views accord with those expressed in the courts below, and the judgment should be affirmed, with costs.

ANDREWS, Ch. J., PECKHAM and BARTLETT, JJ., concur with O'BRIEN, J., for reversal; GRAY and HAIGHT, JJ., concur with FINCH, J., for affirmance.

Judgment reversed.